Scott M. Riemer (SR 5005)
RIEMER & ASSOCIATES LLC
Attorneys for Plaintiff
275 Madison Avenue, 26th Floor
New York, New York 10016
(212) 297-0700
sriemer@riemerlawfirm.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
LAURENCE T. GLICKMAN, M.D.                               19 CV 5908

                     Plaintiff,                           **COMPLAINT**

      -against-                                           ECF CASE

FIRST UNUM LIFE INSURANCE COMPANY

                     Defendant.
------------------------------------------------------------------------X

      Laurence T. Glickman, M.D., by his attorneys Riemer & Associates, LLC, complaining of unlawful conduct by First Unum Life Insurance Company ("Unum") alleges:

## INTRODUCTION

      1.     This is an action arising under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §1001, *et. seq.*, to recover benefits due under an employee benefit plan, to clarify the rights of Dr. Glickman to future benefits under such plan, to recover attorneys' fees and costs and obtain other relief as provided by applicable law.

      2.     This Court has subject matter jurisdiction pursuant to Section 502(e)(1) of ERISA, 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.  Under section 502(f) of ERISA, 29 U.S.C. §1132(f), this Court has jurisdiction without respect to the amount in controversy or the citizenship of the parties.

1

3. Venue is properly in this District pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. §1132(e)(2), in that the LTD Plan, as hereinafter defined, is administered in this District and the Defendant resides or may be found in this District.

## DR. GLICKMAN'S PARTICIPATION IN THE LONG TERM DISABILITY PLAN

4. Dr. Glickman is a board-certified plastic surgeon working at Long Island Plastic Surgical Group, P.C. ("LIPSG").

5. Dr. Glickman also owns 7.69% of LIPSG.

6. Dr. Glickman was provided with long term disability ("LTD") insurance coverage under LIPSG's Group Policy No. 406103 001 issued by Unum, dated July 1, 2014 (the "LTD Plan").

7. At all relevant times, Dr. Glickman was and is a participant in the LTD Plan within the meaning of Section 3(7) of ERISA, 29 U.S.C. §1002(7), in the LTD Plan.

8. At all relevant times, the LTD Plan is and has been an "employee welfare benefit plan" within the meaning of Section 3(1) of ERISA, 29 U.S.C. §1002(1).

9. At all relevant times, Unum is and has been the claims administrator of the LTD Plan within the meaning of Section 3(16)(A) of ERISA, 29 U.S.C. §1002(16)(A).

10. At all relevant times, Unum has been a fiduciary within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. §1002(21)(A).

11. Dr. Glickman filed an application for disability benefits under the LTD Plan on December 8, 2017.

12. A document dated June 5, 2018 purports to amend the LTD Plan (the "Post-Disability Amendment").

## STANDARD OF REVIEW

13. The LTD Plan does not contain language granting Unum discretionary authority to determine eligibility for benefits or to interpret the terms of the LTD Plan.

14. During the claims and administrative review process, Unum failed to comply with the Department of Labor's claim procedure regulations, and its failure to comply was neither inadvertent nor harmless.

15. Upon information and belief, Unum has not adopted claim procedures in accordance with the Department of Labor regulations.

16. For these reasons, *de novo* review applies.

## DR. GLICKMAN, HIS OCCUPATION, AND HIS DISABILITY

17. Dr. Glickman was born on November 18, 1955.

18. Dr. Glickman received his undergraduate degree from Hamilton College and his M.D. degree from McGill University. He also received a master's degree in experimental surgery from McGill University.

19. Dr. Glickman is board-certified by the American Board of Plastic Surgery and the Royal College of Physicians & Surgeons of Canada in General Surgery and Plastic Surgery.

20. Dr. Glickman has been a member of LIPSG since 1991.

21. Dr. Glickman was diagnosed with prostate cancer in February 2016.

22. Dr. Glickman underwent a robotic radical prostatectomy to treat the prostate cancer on September 1, 2016.

23. During the surgery, Dr. Glickman suffered an injury to his pudendal nerve.

24. Due to the injury to his pudendal nerve, Dr. Glickman suffers from pudendal neuralgia, causing him pain in his pelvis, including aching pain in the rectum, perineum, distal meatus, urethra, bladder, the entire penis, and the inner thigh.

25. This pain makes it both difficult to concentrate and difficult to sit.

26. Dr. Glickman is on several medications to manage the pain. The side effects of those medications include fatigue, constipation, and general discomfort.

27. Dr. Glickman has undergone multiple procedures and surgeries to manage or alleviate his pain. These include pulsed radio frequency pudendal nerve blocks, ganglion impar blocks, CT-guided pudendal nerve blocks, pudendal nerve decompression and perineal nerve excision surgery, CT-guided pudendal nerve cryoablation, acupuncture, hyperbaric oxygen therapy, pelvic physical therapy, and deep tissue massage.

28. Dr. Glickman's condition caused him to be limited from performing the material and substantial duties of his occupation.

29. Dr. Glickman has incurred more than a 20% loss in monthly earnings due to his condition.

30. Dr. Glickman is under the regular care of his physicians for his condition.

31. Unum has never disputed that Dr. Glickman's symptoms limit his ability to perform the material duties of his occupation.

32. Dr. Glickman's condition continues to cause him to work at a reduced level and will continue to do so for the foreseeable future.

## THE LTD PLAN'S RELEVANT PROVISIONS

33. The LTD Plan defines "Disability" as follows:

You are disabled when Unum determines that:

- You are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and

- You have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

You must be under the regular care of a physician in order to be considered disabled.

34. The LTD Plan defines the "elimination period" as follows:

You must be continuously disabled through your elimination period. Unum will treat your disability as continuous if your disability stops for 30 days or less during the elimination period. The days that you are not disabled will not count toward your elimination period.

4

Your elimination period is 90 days.

You are not required to have a 20% or more loss in your indexed monthly earnings due to the same injury or sickness to be considered disabled during the elimination period.

35. The LTD Plan defines "Monthly Earnings" as follows:

"Monthly Earnings" means your average gross monthly income as figured:

    a. from the income box on your W-2 form which reflects wages, tips and other compensation received from your Employer for the calendar year just prior to your date of disability; or

    b. for the period of your employment with your Employer if you did not receive a W-2 form prior to your date of disability.

Average gross monthly income is your total income before taxes. It is prior to any deductions made for pre-tax contributions to a qualified deferred compensation plan, Section 125 plan, or flexible spending account. It does not include income received from car, housing or moving allowances, Employer contributions to a qualified deferred compensation plan, or income received from sources other than your employer.

36. The LTD Plan describes how much Unum will pay if a participant is "disabled and working" as follows:

We will send you the monthly payment if you are disabled and your monthly disability earnings, if any, are less than 20% of your indexed monthly earnings, due to the same sickness or injury.

If you are disabled and your monthly disability earnings are from 20% through 80% of your indexed monthly earnings, due to the same sickness or injury, Unum will figure your payment as follows:

During the first 12 months of payments, while working, your monthly payment will not be reduced as long as disability earnings plus the gross disability payment does not exceed 100% of indexed monthly earnings.

    1. Add your monthly disability earnings to your gross disability payment.

    2. Compare the answer in Item 1 to your indexed monthly earnings.

If the answer from Item 1 is less than or equal to 100% of your indexed monthly earnings, Unum will not further reduce your monthly payment.

> If the answer from Item 1 is more than 100% of your indexed monthly earnings, Unum will subtract the amount over 100% from your monthly payment.
>
> After 12 months of payments, while working, you will receive payments based on the percentage of income you are losing due to your disability.
>
> > 1. Subtract your disability earnings from your indexed monthly earnings.
> >
> > 2. Divide the answer in Item 1 by your indexed monthly earnings. This is your percentage of lost earnings.
> >
> > 3. Multiply your monthly payment by the answer in Item 2.
>
> This is the amount Unum will pay you each month.
>
> As part of your proof of disability earnings, we can require that you send us appropriate financial records, which may include income tax returns, which we believe are necessary to substantiate your income.

37. The LTD Plan says that "This policy may be changed in whole or in part. Only an officer or a registrar of Unum can approve a change. The approval must be in writing and endorsed on or attached to this policy. No other person, including an agent, may change this policy or waive any part of it."

38. The employer application is part of the LTD Plan, and the LTD Plan states that the employer application is part of the LTD Plan.

39. The application for the LTD Plan, dated July 7, 2014, states that:

   a. LIPSG is a Subchapter S-Corporation;

   b. Owners are covered under the LTD Plan;

   c. All employees are covered by the LTD Plan; and

   d. All shareholders are employees.

40. The application for the LTD Plan has several options for a definition of insured earnings.

41. Those options for a definition of insured earnings included "Salary Only," "Prior Year W-2," "Prior Year W-2 Without Bonuses," "Salary & Bonuses," "Salary & Commissions,"

6

"Salary, Commissions & Bonuses," "Salary & Overtime," "Partners – Prior Year K-1," "Subchapter S Corporation," "Sole Proprietorship," Teachers Contract (1/12th of annual contract salary)," "Teachers Contract (1/9th or 1/10th of contract salary," and "Other Insured Earnings Definition (please specify)."

42. The application for the LTD Plan has a checkmark next to "Prior Year W-2."

## THE ADMINISTRATIVE PROCESS

### Dr. Glickman Timely Applies for Disability Benefits

43. On December 8, 2017, Dr. Glickman filed an application for LTD benefits.

44. Dr. Glickman's application stated, among other things, that he first noticed symptoms on September 2, 2016; that he shortened his hours; that he cannot perform long procedures, and that he cannot sit for more than ten minutes.

45. On March 19, 2018 a copy of the LTD Plan was added to Dr. Glickman's claim file.

### Unum Delays a Decision on Dr. Glickman's Application So It Can Attempt to Amend the LTD Plan

46. A March 22, 2018 letter from Unum stated that the LTD Plan "includes a defines [sic] Monthly Earnings for W-2 employees only." Unum also stated that the Monthly Earnings definition "would not be applicable for business owners" and that Unum was "in the process of considering the addition of a separate Monthly Earnings definition to include business owners K-1 income as well, since this would be more appropriate for you as an owner."

47. On March 27, 2018, Pamela J. Fox, a lead disability benefits specialist for Unum, requested "documentation of earnings from January 1, 2016 – present" and copies of "Dr. Glickman's W-2's for 2011, 2012, 2013, 2014, 2015, 2016 and 2017."

48. The purpose of this request was to determine whether the inclusion of Dr. Glickman's Schedule K-1 income in Unum's calculation of monthly earnings would benefit Unum by diminishing Dr. Glickman's disability benefits.

7

49. Fox also filled out a March 27, 2018 "AEIC Evaluation Form." The AEIC Evaluation Form states on its face that it is a "Form Initiated by Benefits When Claim has been Submitted and Potential Contact Error is Identified That Could Impact Claim." The Form further states under "Administrative Errors Impacting Claims:" "The BME definition is a W2 definition. We need AEIC to include monthly earnings definition for partners (1120S business) as we should be using the W2 and K1 for the three years prior to determine BME."

50. On April 6, 2018, Janet Parens Chesley, the Director of Human Resources of LIPSG, emailed Fox providing multiple years of paycheck summaries for Dr. Glickman and told Fox that "As a shareholder of LIPSG, Dr. Glickman receives an annual distribution payment based upon the profitability of the overall enterprise, which employs non-owner physicians, physician assistants, medical spa providers, and the like. This passive income is reflected annually in the Form K-1s that Dr. Glickman receives, and would correspond to amounts shown on his personal return. This income is not directly related to Dr. Glickman's productivity, but rather the results of LIPSG as a whole."

51. Fox recorded notes of an April 23, 2018 call with Dr. Glickman during which Fox stated "I was hoping to make a decision on his claims by 4/28/18; however we may need additional ext of time if we do not have sufficient info on file to make a decision."

52. April 28, 2018 was the deadline under 29 C.F.R. § 2560.503-1(f)(3) for Unum to make a decision on Dr. Glickman's claim.

53. On April 23, 2018, in an attempt to make it seem as if there were outstanding items needed to complete the claim file, Fox sent an email to Chesley and Dr. Glickman requesting information that had already been provided to Unum.

54. On April 23, 2018, Dr. Glickman responded to Fox:

I received this and remain concerned, exhausted, (in pain) and not supported by your organization in any genuine or sincere way.

8

> We have given you this information over and over, in so many forms, that it is a joke in my office. You are wearing me down, as is your intent, or so it appears. Do you know how many thousands of dollars I have contributed to these policies over the years, and how much I may be entitled to over the next two years?
>
> Too bad. I did believe you when you said you were my advocate. You sounded sincere, concerned and really lovely on the phone.
>
> Now I am doubting it.

55. On April 27, 2018, Fox claimed Unum faced a new regulatory deadline of May 25, 2018.

56. On May 8, 2018, Fox explicitly linked the regulatory deadline and the change in monthly earnings definition via email, asking Allina Verillo, a small case underwriter at Unum, "when [will] the updated policy . . . be ready for our evaluation purposes? I am on ERISA extension and will need the actual policy available prior to making a decision on his LTD claim."

57. On May 9, 2018 in a phone conversation with Dr. Glickman, Fox said they "discussed current status of financial analysis and that it looks like we will be recalculating his BME using 2017 DOD; however, we are continuing to await updated LTD policy that include BME definition for partners (K-1 and W-2 earnings). I am having financial calculate BME using W-2 only as well as K-1 and W-2 earnings so we have both calculations available to make determination based on approved policy."

58. On May 22, 2018, Fox again linked the change in definition to what she claimed was the regulatory deadline for making a decision and her attempts to claim a request for information was outstanding, emailing a group of Unum employees: "Please confirm if you have received a response from Janet Chesley . . . . I am awaiting the updated LTD policy to include BME definition for partners in order to proceed with making a determination on the claim for Laurence Glickman, NL claim #14266974. A decision on this claim is required under ERISA to be made by 5/24/2018;

9

therefore, any assistance you can provide to get this policy processed on a rush basis would be greatly appreciated."

59. On May 24, 2018, Chesley sent Fox the K-1 tax schedules for all partners at LIPSG.

60. On a call with Chesley on May 24, 2018, Fox confirmed that the only reason a decision had not been made was because of Unum's attempt to amend the LTD Plan. Fox "advised that upon receipt of the updated policy we will then be able to make a determination on his claim; however, it appears that he will not qualify using K-1 and W-2 earnings, since he has several consecutive months where he did not incur the necessary 20% or more loss of earnings."

61. Fox sent Dr. Glickman a letter the same day, again confirming that the delay was due to the attempt to amend the LTD Plan. The letter stated:

> We are writing to let you know that we will be extending the time in which we will be making a decision on your claim until 30 days after we receive confirmation of your employer's Group Long Term Disability plan terms and the effective date of any changes.
>
> We have received additional information from your employer, which is currently being reviewed by our Client Services and Underwriting Department. The following information is needed for us to further evaluate your eligibility for benefits.
>
> Our receipt of the plan terms and effective date of any changes relative to your employer's Group Long Term Disability policy is important so that we can complete our evaluation as to whether benefits are payable.

62. In late May 2018, Unum's legal department said that it would be helpful to have written confirmation from LIPSG that the amendment would be retroactively applicable to the beginning of the policy period.

63. Even if such a confirmation would have had any legal effect, LIPSG never gave such a written confirmation, nor have they ever given any other confirmation.

64. On June 12, 2018, the Post-Disability Amendment was added to the claim file for the first time.

65. The first page of the Post-Disability Amendment has a date of June 5, 2018.

10

66. The Post-Disability Amendment asserts that the "effective date of these changes is July 1, 2014. The changes only apply to disabilities which start on or after the effective date."

67. The Post-Disability Amendment contains a blank signature block for LIPSG.

68. The Post-Disability Amendment is not a valid modification of the LTD Plan.

69. The Post-Disability Amendment was created after Dr. Glickman's onset of symptoms, his date of disability, and his application for disability benefits.

70. LIPSG has never executed the Post-Disability Amendment.

71. Among other changes to the LTD Plan, the Post-Disability Amendment attempts to change the definition of monthly earnings to a two-tier definition:

> Physicians, Management and Directors, All Employees not eligible in another group
>
> "Monthly Earnings" means your average gross monthly income as figured:
>
> a. from the income box on your W-2 form which reflects wages, tips and other compensation received from your Employer for the calendar year just prior to your date of disability; or
>
> b. for the period of your employment with your Employer if you did not receive a W-2 form prior to your date of disability.
>
> Average gross monthly income is your total income before taxes. It is prior to any deductions made for pre-tax contributions to a qualified deferred compensation plan, Section 125 plan, or flexible spending account It does not include income received from car, housing or moving allowances, Employer contributions to a qualified deferred compensation plan, or income received from sources other than your Employer.
>
> Partners/Owners
>
> "Monthly Earnings" means your average monthly income from your Employer just prior to your date of disability and is computed based on the sum of your Schedule K-1 and W-2 income averaged over the lesser of:
>
> a. the 3 most recent tax years (36 months); or
>
> b. the period that you have been an owner, if you have been an owner for less than 3 years

11

> Schedule K-1 income is derived from the line that refers to "ordinary income (loss) from trade or business activities" received from your Employer.

**<u>Unum Approves Dr. Glickman's Claim Using Definitions from the Post-Disability Amendment, over Six Months after the Application</u>**

72. On June 28, 2018, Unum informed Dr. Glickman by letter that his claim for disability benefits had been approved (the "Approval Letter"). The Approval Letter used definitions from the Post-Disability Amendment and stated that:

   a. Dr. Glickman began reducing work productivity as of September 1, 2016.

   b. Dr. Glickman's disability date was November 1, 2017.

   c. Monthly earnings include K-1 income and W-2 earnings averaged over "the 3 most recent tax years (36 months)."

   d. Unum calculated Dr. Glickman's "monthly earnings to be $74,454.50[1] using . . . 2016 K-1 and W-2 earnings."

   e. Unum determined that Dr. Glickman incurred a greater than 20% loss of earnings in February, June, July, and November 2017 and January, March, and April 2018, and he did not incur a 20% or more loss of earnings in January, March, April, May, September, or October 2017.

   f. The 90-day elimination period was met on March 29, 2018.

   g. Dr. Glickman did not incur a 20% or more loss of earnings in May 2018.

73. Unum released a benefit payment on the same day as the Approval Letter in the amount of $22,308.04 for the period of March 30, 2018 through April 30, 2018.

74. On September 12, 2018, Unum sent Dr. Glickman the Post-Disability Amendment for the first time by emailing it to his attorneys.

---

[1] $74,454.50 is Dr. Glickman's Schedule K-1 income from 2014 through 2016 added to his form W-2 earnings from 2014 through 2016 divided by 36.

12

75. On September 14, 2018, Dr. Glickman requested the claim file. The claim file was sent on September 21, 2018.

**<u>Dr. Glickman Files a Timely Appeal and the Calculation in the Approval Letter is Upheld</u>**

76. On January 23, 2019, Dr. Glickman appealed the portion of the Approval Letter regarding the calculation of Dr. Glickman's monthly LTD benefits (the "Appeal").

77. In the Appeal, Dr. Glickman argued: (a) that Dr. Glickman's Schedule K-1 income is passive income, not earnings received for work performed; and (b) that the use of "earnings" rather than "income" shows that the definition of Disability Earnings is limited to earnings (wages/salary) rather than all income.

78. A letter from Chesley attached to the Appeal stated that:

> Dr. Glickman's K-1 income represents strictly passive income from (1) the creams and other products associated with Deep Blue Med Spa – a spa overseen by LIPSG, and (2) the profits generated by associates at the medical practice. Dr. Glickman receives the K-1 income because of his ownership interest in the medical practice and would continue this income even if he were no longer performing plastic surgery for LIPSG. Dr. Glickman's K-1 income is the same as other partners of LIPSG with a 7.142857% ownership interest.

79. On March 8, 2019, Unum denied the Appeal in a letter stating that it "determined the decision on Dr. Glickman's claim is correct. The Benefits Center's calculations of Dr. Glickman's disability earnings to include both his W-2 and K-1 is appropriate under the terms and provisions of the policy."

80. The March 8, 2019 appeal denial letter went on to say that during "the Benefits Center's review of Dr. Glickman's Long Term Disability policy and claim, it was determined the definition of Monthly Earnings was specific to W-2 employees only and would not be applicable to business owners. As such, the Benefits Center appropriately had the definition of Monthly Earnings adjusted to properly reflect the inclusion of K-1 income for any and all business owners under the Long Term Disability Policy."

81. Dr. Glickman exhausted all administrative remedies under the LTD Plan.

## DR. GLICKMAN'S INCOME AND UNUM'S CALCULATION OF BENEFITS

82. Dr. Glickman receives several types of income due to his involvement with LIPSG.

83. Dr. Glickman receives income matching his 401(k) contributions from LIPSG. This income is explicitly exempted from the calculation of Dr. Glickman's pre-disability monthly earnings under both the LTD Plan and the Post-Disability Amendment.

84. Unum is aware of Dr. Glickman's income matching his 401(k) contributions from LIPSG, and Unum has not included it in its calculation of Dr. Glickman's pre-disability monthly earnings.

85. Dr. Glickman receives a distribution of profits once a year from Physicians Administrative and Billing Services, LLC ("PABS"), a company owned by partners of LIPSG that provides medical billing and collections services. Dr. Glickman provides no services to PABS.

86. Every one of the thirteen partners of LIPSG owns the same percentage of PABS – 7.69% or 1/13.

87. The distribution of profits Dr. Glickman receives every year from PABS is 7.69% of the yearly profits of PABS and does not depend on his productivity at LIPSG.

88. The distribution of profits Dr. Glickman receives every year from PABS is reflected in a Schedule K-1.

89. Unum is aware of Dr. Glickman's PABS income and has not included it in its calculation of Dr. Glickman's pre-disability monthly earnings.

90. Dr. Glickman receives a distribution of profits once a year from LIPSG.

91. Every one of the thirteen partners of LIPSG owns the same percentage of LIPSG – 7.69% or 1/13.

92. The distribution of profits Dr. Glickman receives every year from LIPSG is 7.69% of the yearly profits of LIPSG and does not depend on his productivity at LIPSG.

93. The distribution of profits Dr. Glickman receives every year from LIPSG is reflected in a Schedule K-1.

94. Dr. Glickman receives biweekly wages from LIPSG that reflect a current estimate of expected W-2 earnings for the year. Dr. Glickman's W-2 earnings are based upon a formula that incorporates his net collections generated for the year (gross collections less the direct cost of goods sold such as implants and injectables) that is designed to account for a payment of overhead costs to LIPSG. Dr. Glickman's biweekly W-2 earnings are adjusted quarterly as necessary.

95. Dr. Glickman's wages from LIPSG are reflected on a Form W-2 at the end of the year.

96. Under the Post-Disability Amendment, pre-disability monthly earnings are calculated by adding the previous three tax years of Schedule K-1 income to the previous three tax years of Form W-2 earnings and dividing by 36.

97. Under the LTD Plan, pre-disability monthly earnings are calculated by dividing the previous tax year's Form W-2 earnings by 12.

98. Schedule K-1 income is not mentioned in the LTD Plan, and it is not included when calculating pre-disability monthly earnings under the LTD Plan.

99. Unum has been calculating Dr. Glickman's monthly disability benefit using the formulas contained in the Post-Disability Amendment.

100. Unum should be calculating Dr. Glickman's monthly disability benefit using the formulas contained in the LTD Plan.

101. As a result, Unum has underpaid Dr. Glickman in several months since the Approval Letter and will continue to do so.

## UNUM'S CONFLICT OF INTEREST

102. At all relevant times, Unum has been operating under an inherent conflict of interest and structural conflict of interest because, on the one hand, Unum is liable for benefit payments due to Dr. Glickman and, on the other hand, each payment depletes Unum's assets.

103. Unum's determination was influenced by this conflict of interest.

104. Unum has failed to take active steps to reduce potential bias and to promote accuracy of its benefits determinations.

## COUNT I

105. Dr. Glickman repeats and re-alleges the allegation set forth in paragraphs 1 through 104 above.

106. Unum had no legal basis for denying Dr. Glickman's benefits.

107. Under the terms of the LTD Plan, Unum agreed to provide Dr. Glickman with certain disability insurance benefits in accordance with the terms and conditions set forth.

108. To date, Unum has failed and refused to pay Dr. Glickman the benefits to which he is rightfully entitled from January 2017 through present.

109. Dr. Glickman has satisfied all conditions precedent under the LTD Plan and is thus eligible to receive benefits.

110. Unum has financial conflicts of interest, as both the administrator of the LTD Plan and the payor of benefits thereunder, when deciding which definition of earnings to apply to Dr. Glickman's claim.

111. The unlawful behavior of Unum is evidenced by the following:

   a. Denying benefit payments to Dr. Glickman at a time when it knew that he was entitled to said benefits under the terms of the LTD Plan, in bad faith and contrary to the LTD Plan;

b. Unreasonably withholding payments from Dr. Glickman knowing his claim for benefits was valid;

c. Unreasonably making lower payments to Dr. Glickman than he is owed under the LTD Plan, in bad faith and contrary to the LTD Plan;

d. Attempting to amend the LTD Plan after Dr. Glickman became disabled and after Dr. Glickman filed an application for disability benefits;

e. Failing to render a timely decision on Dr. Glickman's application for benefits pursuant to 29 C.F.R. § 2560.503-1(f)(3);

f. Failing to provide a "full and fair review" as it was obligated to do pursuant to 29 C.F.R. § 2560.503-1(h)(4);

g. Failing to follow its own internal claims administration policies and procedures;

h. Failing to maintain and utilize "reasonable claims procedures" as it was obligated to do pursuant to 29 C.F.R. § 2560.503-1(b), in violation of ERISA; and

i. Consistently acting in its own corporate interests instead of those of the LTD Plan and its participants.

112. Unum was required to discharge its duties "solely in the interests of the participants and beneficiaries of the plan."

113. Unum breached its fiduciary duty to Dr. Glickman by placing its financial interests in reducing its expenses and increasing its profitability above Dr. Glickman's interests under the LTD Plan to receive disability benefits.

114. A "higher than marketplace" quality standard, as set forth in *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008), applies to evaluating the actions of Unum in this case.

115. Unum violated the higher-than-marketplace standards that ERISA imposes on insurers.

116. Dr. Glickman has been forced to bring the instant action as a direct result of Unum's unlawful benefit denial and violations of the LTD Plan and ERISA.

117. Under Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), Dr. Glickman is entitled to recover disability benefits under the LTD Plan that have not been paid to date, with interest, and those that will become due in the future.

## COUNT II

118. Dr. Glickman repeats and re-alleges the allegations set forth in paragraphs 1 through 117 above.

119. By reason of Unum's failure to pay Dr. Glickman long term disability benefits as due under the terms of the LTD Plan, Dr. Glickman has been forced to retain attorneys to recover such benefits, for which Dr. Glickman has and will continue to incur attorney's fees.  Dr. Glickman is entitled to recover reasonable attorney's fees and the costs of this action, pursuant to Section 502(g)(1) of ERISA, 29 U.S.C. § 1132(g)(1).

**WHEREFORE**, Dr. Glickman demands judgment against Unum:

A. For the amount of all long-term disability benefits due under the terms of the LTD Plan that have not been paid, together with interest thereon;

B. Declaring that Dr. Glickman's claim for disability benefits is governed by the terms of the LTD Plan and that the Post-Disability Amendment is invalid as to Dr. Glickman's claim for disability benefits;

C. Clarifying and declaring that the LTD Plan is obligated to pay Dr. Glickman long term disability benefits in the future as required by the LTD Plan;

D. For the costs of this action and Dr. Glickman's attorney's fees, pursuant to Section 502(g) of ERISA, 29 U.S.C. § 1132(g); and

E. For such other and further relief as may be deemed just and proper by the Court.

Dated:   New York, New York
June 24, 2019

                                  By:   /s/ Scott M. Riemer
Scott M. Riemer (SR 5005)
RIEMER & ASSOCIATES LLC
Attorneys for Dr. Glickman
275 Madison Avenue, 26th Floor
New York, New York 10016
(212) 297-0700
sriemer@riemerlawfirm.com